**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**June 28, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

_____

CHRIS HAULMARK,

    Plaintiff - Appellant,

v.

CITY OF WICHITA; BRANDON
WHIPPLE, in his official capacity as the
Mayor of the City of Wichita,

    Defendants - Appellees.

No. 22-3243
(D.C. No. 6:21-CV-01182-EFM-TJJ)
(D. Kan.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **MATHESON**, **BALDOCK**, and **McHUGH**, Circuit Judges.
_____

Pro se Plaintiff-Appellant Chris Haulmark, who is deaf, sued the City of

Wichita and its mayor, Brandon Whipple, under Title II of the Americans with

Disabilities Act, 42 U.S.C. § 12132.  He alleged they had deprived him of the

_____

[*] After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination of
this appeal.  *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  The case is therefore
ordered submitted without oral argument.  This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel.  It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

benefits of services, programs, and activities provided to the public through the City's official social media pages and the mayor's personal campaign Facebook page.

The district court (1) denied Mr. Haulmark's motion to compel discovery concerning the mayor's personal campaign Facebook page, (2) granted summary judgment to the Defendants, and (3) denied Mr. Haulmark's motion for leave to amend his complaint. As part of its reasoning, the court said the mayor's campaign page was not a service, program, or activity of the City under the ADA.

After Mr. Haulmark appealed, the Supreme Court decided *Lindke v. Freed*, 601 U.S. 187 (2024). There, the Court determined that "a public official's social-media activity constitutes state action under [42 U.S.C.] § 1983 . . . if the official (1) possessed actual authority to speak on the State's behalf, and (2) purported to exercise that authority when he spoke on social media." 601 U.S. at 198. We requested supplemental briefing. In their briefs, both sides acknowledge that *Lindke* may be relevant here but disagree about how it should apply.

We conclude that (1) the district court should not have granted summary judgment on Mr. Haulmark's claims involving the City's social media pages, and (2) *Lindke* calls for the district court to reconsider its rulings concerning the mayor's personal campaign Facebook page.

Exercising jurisdiction under 28 U.S.C. § 1291, we reverse summary judgment in part, vacate the district court's judgment in part, and remand for further proceedings.[1]

## I. BACKGROUND

### A. *Mr. Haulmark's Claims*

Mr. Haulmark claimed that (1) the City's social media pages and (2) the mayor's campaign page denied him access to public benefits and services in violation of Title II of the ADA. The complaint named the mayor only in his official capacity. We briefly recount the claims.

### 1. The City's Social Media Pages

Mr. Haulmark's complaint alleged that the City's official Facebook and YouTube pages denied him and other deaf and hard-of-hearing individuals "access to . . . benefits that . . . individuals without hearing disabilities are able to take advantage of." ROA at 345.

Facebook and YouTube provide auto-captioning for certain videos posted on their platforms, including videos posted on the City's social media pages. In addition, before receiving notice of Mr. Haulmark's complaint, the City's pages contained captioning provided by a third-party vendor for pre-recorded and live videos. After Mr. Haulmark filed his complaint, the City purchased in-house

---

[1] Mr. Haulmark proceeds pro se, so "we liberally construe his filings, but we will not act as his advocate." *James v. Wadas*, 724 F.3d 1312, 1315 (10th Cir. 2013).

captioning equipment.  It claimed this equipment achieved full functionality by November 2021.

Although Mr. Haulmark did not dispute the Defendants' facts concerning the City's efforts to provide captioning, *see* ROA at 236-37 (City's statement of undisputed facts 7, 10-12); *id.* at 330 (Haulmark's response admitting City's factual statements), he claimed that some of the City's online videos lacked captions, *see id.* at 345, and that the captioning the City did provide inadequately communicated to deaf and hard-of-hearing individuals.

## 2. The Mayor's Campaign Page

The mayor's Facebook campaign page was (and currently is) accessible at https://www.facebook.com/VoteWhipple.[2]  In their summary judgment briefing, the Defendants asserted:

(1)  the page included "an email address and phone number that are not associated with Defendant City of Wichita,"

(2)  its banner picture included "Defendant Whipple's three children, as well as a smaller picture of Defendant Whipple and his wife," and

(3)  the page was linked to a donation and support page for the mayor as a political candidate.

ROA at 237.

Mr. Haulmark complained that the mayor performed his official duties on the campaign page through live video streams that provided information about City

---

[2] Last visited June 27, 2024 - https://perma.cc/3NJU-M3ES.

police department reform, transportation issues, and the COVID pandemic. ROA at 341-42. In opposing summary judgment, Mr. Haulmark said the mayor provided "critical health and safety information" and "responses from a variety of local, state, and federal level authorities." ROA at 337. The mayor also allegedly "solicit[ed] audience questions" and the public's "thoughts and opinions." ROA at 337-38. Mr. Haulmark claimed the mayor characterized his campaign page as an "official page." ROA at 340.

Mr. Haulmark further alleged that the campaign page is inaccessible to deaf and hard-of-hearing individuals and that the mayor had banned him from the page for raising accessibility issues. He claimed that because the mayor conducted official City business on this page and because that page provides access to "services, programs, or activities" of the City, § 12132, he suffered an ADA Title II violation.[3]

## B. *District Court Orders*

On appeal, Mr. Haulmark challenges three district court orders.

### 1. Denial of Mr. Haulmark's Motion to Compel Discovery

Mr. Haulmark moved to compel discovery concerning the mayor's campaign page. His motion sought information about the page's content, changes made to it,

---

[3] Brandon Whipple is no longer the Wichita mayor. The campaign page claim is not moot because Mr. Haulmark sued Mayor Whipple in his official capacity and seeks damages. *See* ROA at 35; *Lippoldt v. Cole*, 468 F.3d 1204, 1217 (10th Cir. 2006) (claim for compensatory damages for past conduct was not moot).

persons blocked from it, the individuals responsible for managing it, and communications between the mayor and others through the page.

A magistrate judge denied his motion, concluding Mr. Haulmark had "not shown that his discovery requests relating to [the mayor's] personal campaign finance Facebook page are relevant to this [ADA] case."  ROA at 185.

The district court upheld the magistrate judge's order, stating that

(1) it could find no case law suggesting that the mayor's activities on his campaign page had denied Mr. Haulmark the benefit of the City's services;

(2) the City had not violated ADA regulations that prohibited entities from discriminating through contractual, licensing, or other arrangements, because "to consider communications on a public employee's campaign page as services of the public entity is a bridge too far," ROA at 229; and

(3) even if Mr. Haulmark sought only to ensure that the video or audio recordings relevant to the City's business that were posted to the campaign page met ADA standards, "[t]here is simply no support in the law for [his] assertion that Title II requires public entities to fund accessibility services on employees' personal social media accounts or campaign pages simply because the employees reference the entity's official business."  ROA at 230.

2. **Summary Judgment for the City and Mayor**

The district court granted summary judgment on both claims.

a.  *The City's social media pages*

On the claim concerning the City's Facebook and YouTube pages, the district court found that before Mr. Haulmark filed his complaint, the City had already provided (1) "captioning for both pre-recorded and live videos through a third-party service provider" and (2) automatic captioning for some videos through Facebook and YouTube.  ROA at 923.  It further found that after Mr. Haulmark filed his

6

complaint, the City "purchased in-house captioning equipment, bringing these systems up to full functionality by November 2021." *Id.*

The district court determined that Mr. Haulmark had "presented no evidence of the City's failure to provide reasonable accommodations to deaf individuals." ROA at 929. It pointed to the captioning the City had provided and concluded that the defendants "offered [Mr.] Haulmark reasonable accommodations and . . . [he] simply failed to take advantage of them." ROA at 930 (quotations omitted).

b. *The mayor's campaign page*

On the campaign page claim, the court cited the ADA's definition of a "public entity," which includes "any State or local government; [or] any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1). Based on this definition, it noted that neither the mayor nor the campaign page is a public entity and thus the mayor "cannot be held liable under Title II for denying his own private services to others or discriminating against others." ROA at 928. The court also determined that neither the mayor's campaign nor his campaign page is a "public entity's service, program, or activity," and the page therefore poses no barrier under Title II to the City's services, programs, and activities. *Id.*

3. **Denial of Mr. Haulmark's Motion to Amend**

Six months after the scheduling order deadline had passed for amending the complaint, Mr. Haulmark moved to amend. His motion identified six additional claims, including "Section 1983 claims relating to free speech, petitioning the

7

government, and retaliation, and to add [the mayor] in his individual capacity as a new party." ROA at 277.

The district court denied the motion. It found that

(1) Mr. Haulmark had offered no adequate explanation for his six-month delay in seeking to amend after the deadline had expired;

(2) allowing him to add the new claims while the defendants' motion for summary judgment was pending would prejudice the defendants; and

(3) he had presented no new evidence to support his new claims and had made no showing of diligent efforts to meet the scheduling order deadline.

## II. DISCUSSION

We reverse the district court's summary judgment concerning the City's social media pages. We further conclude the summary judgment decision on the mayor's campaign Facebook page should be vacated and remanded in light of the Supreme Court's recent decision in *Lindke v. Freed* and of any related need for additional development of the factual record. We also vacate the rulings on the motions to compel discovery and for leave to amend and remand for reconsideration.

### A. *Title II of the ADA*

To state a claim under Title II of the ADA, a plaintiff must allege:

(1) he is a qualified individual with a disability;

(2) he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and

(3) such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability.

8

*Crane v. Utah Dep't of Corr.*, 15 F.4th 1296, 1312 (10th Cir. 2021) (quotations omitted).

A "public entity" includes any State or local government, department, agency, special purpose district, or other instrumentality of a State or States or local government. § 12131(1). And "an agency's services, programs, and activities refer to the 'outputs' it provides some public constituency." *Elwell v. Okla. ex rel. Bd. of Regents*, 693 F.3d 1303, 1306 (10th Cir. 2012).[4] To satisfy Title II, a public entity must provide meaningful access to programs and services, making reasonable modifications where necessary. *See Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1195 (10th Cir. 2007).

The regulations implementing Title II state that a public entity must "take appropriate steps to ensure that communications" with deaf or hard-of-hearing persons "are as effective as communications with others." 28 C.F.R. § 35.160(a).

The regulations further provide:

(b) (1) A public entity shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities, including applicants,

---

[4] Only public entities are subject to the ADA's provision barring discrimination based on disability in public services, programs, and activities. *See City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 610 (2015). It follows that an individual cannot be held liable under Title II. *See generally id.* Because Mr. Haulmark sued the mayor in his official capacity, the campaign page claim is effectively a claim against the City. *See Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010) ("Suing individual defendants in their official capacities . . ., we've recognized, is essentially another way of pleading an action against the county or municipality they represent."); *see also Aubrey v. Koppes*, 975 F.3d 995, 1004 (10th Cir. 2020) (treating ADA claims against county clerk and recorder sued in her official capacity as claims against the county).

participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity.

(2) The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place. In determining what types of auxiliary aids and services are necessary, a public entity shall give primary consideration to the requests of individuals with disabilities. In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability.

*Id.* § 35.160(b); *see also Robertson*, 500 F.3d at 1195-96 (quoting regulation).

We have stated that "[t]he *only* limitation on these duties is that a public entity is not required 'to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens.'" *Robertson*, 500 F.3d at 1196 (quoting 28 C.F.R. § 35.164) (emphasis added).

The regulation refers to "appropriate" and "necessary" aids and services that provide "effective" communication. Courts have held that although a reasonable accommodation must be "effective," it need not be "a perfect accommodation or the very accommodation most strongly preferred" by the individual. *Noll v. Int'l Bus. Machs. Corp.*, 787 F.3d 89, 95 (2d Cir. 2015) (rejecting, in ADA employment discrimination case, deaf employee's claim that he was entitled to have captioning or

a transcript available for every video or audio file when file was posted to corporate intranet).[5]

The reasonable accommodation inquiry is necessarily fact-specific because a given technology may fall short of being reasonable in a particular individual's case. *See, e.g.*, *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1137 (9th Cir. 2001).[6]  Also, the plaintiff is in the best position to determine what type of aid or service will be effective.  *See Argenyi v. Creighton Univ.*, 703 F.3d 441, 446 (8th Cir. 2013).

## B.  *Summary Judgment Rulings*

We review the district court's grant of summary judgment de novo, applying the same standard the district court used.  *Harvest Grp., LLC v. Love's Travel Stops & Country Stores, Inc.*, 90 F.4th 1271, 1280 (10th Cir. 2024).  "The court shall grant

---

[5] *See also* 28 C.F.R. pt. 35, app. A, § 35.160 (noting that although public entities must "give primary consideration to the requests of individuals with disabilities," public entities need not provide the precise form of auxiliary aid requested so long as they "can demonstrate that another effective means of communication exists" (quotations omitted)); *Petersen v. Hastings Pub. Sch.*, 31 F.3d 705, 708-09 (8th Cir. 1994) (rejecting plaintiffs' argument that school district violated Title II by refusing to utilize the "signing system" of plaintiffs' choice).

[6] In *Duvall*, the court held that a genuine issue of material fact existed concerning whether an assistive listening device was sufficient as a reasonable accommodation to provide access to court proceedings, because even together with plaintiff's assignment to a courtroom designed for hearing-impaired persons, the system's "earbuds . . . would provide only general amplification and would impede his natural hearing ability," 260 F.3d at 1131, and the plaintiff had demonstrated a genuine factual issue concerning whether a different accommodation—real-time transcription—would have been available and appropriate.  *See generally Punt v. Kelly Servs.*, 862 F.3d 1040, 1050 (10th Cir. 2021) ("The determination of whether a requested accommodation is reasonable must be made on the facts of each case taking into consideration the particular individual's disability.").

summary judgment if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

We (1) reverse summary judgment on Mr. Haulmark's city pages claim and (2) vacate summary judgment on his campaign page claim and remand.

1. **The City's Social Media Pages**

Although the City asserted that its captioning reasonably accommodated Mr. Haulmark, the record reveals genuine disputes of material fact.

a. *Summary judgment record*

i. The City's evidence

The record provides few specifics about the City's captioning and the level of accessibility it provides. The City relied exclusively on the affidavit of Tyler Schiffelbein, its Communications Manager. He stated that before the City received notice of Mr. Haulmark's complaint, which was filed in July 2021, it "already offered captioning services for all pre-recorded and live videos [it] posted" on its Facebook and YouTube pages. ROA at 252. He said that beginning in 2009, the City used a third-party vendor, now called VITAC, to provide captioning services. The City did not provide an example of VITAC's captions or further evidence about the VITAC system.

The remainder of Mr. Schiffelbein's affidavit is unclear about whether and how the VITAC system or some other in-house system provided captions for all or part of the City's social media videos from 2009 onward. He said the City's YouTube pages have been closed captioned since 2010, but mentioned only

12

YouTube's auto-captioning, ROA at 253, and did not say how VITAC captioning may have provided supplemental captioning before November 2021. Mr. Schiffelbein also stated the City used Facebook's auto-captioning, but only beginning in 2020, and that the City then shifted to using its own captioning equipment for the Facebook videos in November 2021. Finally, he stated that in October 2021, the City purchased captioning hardware from Link Electronics that became operational in November 2021. *See id.* The affidavit thus does not clearly explain which captioning systems were used for YouTube and Facebook videos and when between 2009 and November 2021, or what level of service the captioning provided.

ii. Mr. Haulmark's evidence

In response to the City's motion, Mr. Haulmark's affidavit identified two deficiencies in the City's captioning. First, he claimed that "[m]any online videos on the City's Facebook pages are missing captions," and that the captioning the City did provide on its YouTube channel was inadequate. ROA at 375. Second, he stated that the "automatic machine-generated captioning" on the City's videos "frequently contain[ed] errors," sometimes did not "show [him] who the dialogue lines belong to," and "[made] it impossible for [him] to determine whether a dialogue line is a statement or a question." *Id.* at 374-75.

Mr. Haulmark also provided evidence that the City's captioning did not reasonably accommodate his needs. For example, he supplied a screenshot of the City's YouTube channel page, which provides links to programs called "What's Up Wichita With Mayor Brandon Whipple" and "ICT Council Chat." ROA at 380. All

13

of the ICT Council Chat video links are marked "CC," suggesting they are closed captioned, but only three of the five "What's Up Wichita" video links contain the "CC" designation. *Id.*

Mr. Haulmark also submitted a July 29, 2021, email message from Mr. Schiffelbein stating the City's "current provider" was "*only* captioning city council meetings." ROA at 401 (emphasis added). In a July 1, 2021, message, Mr. Schiffelbein stated that with Link Electronics, the City "would be able to caption a lot more than [it was] currently doing" and that the new system would be ADA compliant. ROA at 403.

b. *Genuine disputes of material fact*

The foregoing evidence shows a genuine dispute of material fact at least over whether the City posted some social media videos without any captioning. Whether the captioning the City *did* provide reasonably accommodated the needs of deaf and hard-of-hearing persons also amounts to a genuine factual dispute.

The district court did not evaluate whether the City took appropriate steps through its captioning to ensure that communications with Mr. Haulmark were "as effective as communications with others." § 35.160(a). Instead, it simply concluded that he failed to cite evidence to support his argument that the City's captioning is ineffective. ROA at 930. But Mr. Haulmark submitted examples of City videos with transcripts of captioning that appear to provide only ambiguously worded, bare-bones captions that he says he cannot adequately understand. *See, e.g.,* ROA at 434-38, 447-515. These captions did not indicate who was speaking or whether a question

14

was being asked. According to Mr. Haulmark, the automatic, machine-generated captions "ma[de] it difficult or impossible for [him] to understand the information being provided on issues of public concern." ROA at 374-75.

Many of Mr. Haulmark's examples date from *after* the City says it installed ADA-compliant captioning in November 2021. ROA at 447-515. Mr. Haulmark also provided a set of captions from another county's social media page that he claims did not contain the defects he identified on the City's pages, *see* ROA at 516-34, suggesting better captioning may be reasonably available. *See Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1273 (10th Cir. 2015) (discussing plaintiff's burden to show facially reasonable accommodation).

For these reasons, we reverse the grant of summary judgment concerning the City's social media pages.

### 2. The Mayor's Campaign Page

As the district court observed, little or no authority addresses whether a city official's personal social media activity can be a program, service, or activity under Title II. The issue is whether the mayor's use of his campaign page to conduct official business "excluded" Mr. Haulmark "from participation in or . . . denied the benefits of" the City's "services, programs, or activities." § 12132.

#### a. Lindke v. Freed

*Lindke* concerned a Facebook page that Mr. Freed created several years before becoming the city manager of Port Huron, Michigan. *Lindke*, 601 U.S. at 191. Like Mayor Whipple's page, Mr. Freed's included both private and official features:

15

> For his profile picture, Freed chose a photo of himself in a suit with a city lapel pin. In the "About" section, Freed added his title, a link to the city's website, and the city's general email address. He described himself as "Daddy to Lucy, Husband to Jessie and City Manager, Chief Administrative Officer for the citizens of Port Huron, MI."
>
> As before his appointment, Freed operated his Facebook page himself. And, as before his appointment, Freed posted prolifically (and primarily) about his personal life. He uploaded hundreds of photos of his daughter. He shared about outings like the Daddy Daughter Dance, dinner with his wife, and a family nature walk. He posted Bible verses, updates on home-improvement projects, and pictures of his dog, Winston.
>
> Freed also posted information related to his job. He described mundane activities, like visiting local high schools, as well as splashier ones, like starting reconstruction of the city's boat launch. He shared news about the city's efforts to streamline leaf pickup and stabilize water intake from a local river. He highlighted communications from other city officials, like a press release from the fire chief and an annual financial report from the finance department. On occasion, Freed solicited feedback from the public—for instance, he once posted a link to a city survey about housing and encouraged his audience to complete it.

*Id.* at 191-92.

Mr. Freed posted information to Facebook about the COVID-19 pandemic. *See id.* at 192. A constituent, Mr. Lindke, posted comments critical of Mr. Freed's management of pandemic issues. Mr. Freed deleted these comments and ultimately blocked Mr. Lindke from his page. *See id.* at 193. Mr. Lindke sued Mr. Freed under § 1983 for violating his First Amendment rights. The district court granted summary judgment, concluding Mr. Freed had not acted in a public capacity in managing his Facebook page. The Sixth Circuit affirmed. *See id.*

16

The Supreme Court vacated the Sixth Circuit's summary judgment and remanded for further proceedings. The Court said the case required analysis of "whether a state official engaged in state action or functioned as a private citizen." *Id.* at 196 (emphasis omitted). It noted that although state officials act under the authority of the state, they also "have private lives and their own constitutional rights." *Id.* at 197. To balance these interests, the Court adopted a two-part test, holding that "a public official's social-media activity constitutes state action under § 1983 only if the official (1) possessed actual authority to speak on the State's behalf, and (2) purported to exercise that authority when he spoke on social media." *Id.* at 198.

The Court further stated that "[a]n official cannot insulate government business from scrutiny by conducting it on a personal page" and emphasized that where the personal and official nature of a page is "ambiguous," categorizing posts to that page "is a fact-specific undertaking in which the post's content and function are the most important considerations." *Id.* at 202 n.2, 203.

b. *Remand*

Without the benefit of *Lindke*, the district court focused on the ownership and control of Mayor Whipple's campaign page rather than the mayor's possible exercise of a governmental function on that page. The district court's summary judgment on

the campaign page claim should be reconsidered in light of *Lindke*.  We vacate that ruling and remand.[7]

## C. *Motions to Compel and for Leave to Amend*

*Lindke* addressed an issue analogous to Mr. Haulmark's campaign page claim, but it also may be relevant to his motion to compel because the Supreme Court in *Lindke* prescribed a fact-based approach that may warrant further discovery.  *See* 601 U.S. at 203.  Less clear is whether *Lindke* would affect Mr. Haulmark's motion to amend his complaint.  We vacate the district court's orders on these issues and remand to ensure they receive full consideration.

## III. **CONCLUSION**

We reverse the district court's summary judgment concerning the City's social media pages.  We vacate the court's summary judgment on Mr. Haulmark's claim about the mayor's campaign Facebook page, and the court's denial of his motions to compel and to amend his complaint.  We remand for further proceedings consistent with this order and judgment.

Entered for the Court

Scott M. Matheson, Jr.
Circuit Judge

[7] In denying summary judgment on this claim, the district court said the mayor is not a public entity, but, as noted above, the mayor was sued in his official capacity, making the claim one against the City.  *See* note 4, *supra*.